# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

TRINSETTA WALLACE,

      **Plaintiff,**

    v.           Case No. 19-CV-1002

ANDREW M. SAUL,
**Commissioner of the Social Security Administration,**

      **Defendant.**

# DECISION AND ORDER

**1. Introduction**

  Plaintiff Trinsetta Wallace alleges that she has been disabled since October 13, 2011 (Tr. 276), and therefore seeks supplemental security income. After her application was denied initially (Tr. 133) and upon reconsideration (Tr. 150), hearings were held before an administrative law judge (ALJ) on April 23, 2018, and September 18, 2018 (Tr. 33-114). On November 5, 2018, the ALJ issued a written decision concluding that Wallace was not disabled. (Tr. 10-26.) After the Appeals Council denied Wallace's request for review on May 21, 2019 (Tr. 1-4), Wallace filed this action. All parties have consented to the full jurisdiction of a magistrate judge (ECF Nos. 5, 8), and the matter is ready for resolution.

## 2. ALJ's Decision

In determining whether a person is disabled an ALJ applies a five-step sequential evaluation process. 20 C.F.R. § 416.920(a)(4). At step one the ALJ determines whether the claimant has engaged in substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(i). The ALJ found that Wallace "has not engaged in substantial gainful activity since May 13, 2016, the application date." (Tr. 15.)

The analysis then proceeds to the second step, which is a consideration of whether the claimant has a medically determinable impairment or combination of impairments that is "severe." 20 C.F.R. § 416.920(a)(4)(ii), (c). An impairment is severe if it significantly limits a claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 416.922(a). The ALJ concluded that Wallace has the following severe impairments: "schizoaffective disorder; borderline intelligence; major depressive disorder; learning disorder; and status post 2011 bi-malleolar ankle fracture open reduction internal fixation surgery." (Tr. 16.)

At step three the ALJ is to determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (called "the listings"), 20 C.F.R. § 416.920(a)(4)(iii), 416.925. If the impairment or impairments meets or medically equals the criteria of a listing and also meets the twelve-month durational requirement, 20 C.F.R. § 416.909, the claimant is disabled. 20 C.F.R. § 416.920(d). If the claimant's

2

impairment or impairments is not of a severity to meet or medically equal the criteria set forth in a listing, the analysis proceeds to the next step. 20 C.F.R. § 416.920(e). The ALJ found that Wallace "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (Tr. 16.)

In between steps three and four the ALJ must determine the claimant's residual functional capacity (RFC), which is the most the claimant can do despite her impairments. 20 C.F.R. § 416.945(a). In making the RFC finding, the ALJ must consider all of the claimant's impairments, including impairments that are not severe. 20 C.F.R. § 416.945(a)(2). In other words, "[t]he RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p. The ALJ concluded that Wallace has the RFC

> to perform light work as defined in 20 CFR 416.967(b), subject to no ladders, ropes or scaffolds, no unprotected heights, heavy equipment, operating machinery or hazards. She is able to stand and walk for one hour at a time, four out eight [sic] cumulatively. She is able to sit six hours cumulatively. She is able to understand, remember and apply simple information. She is able to adjust to routine changes in process and priority, but she needs rote work of limited variability and which requires end of day performance expectations, not hourly performance expectations. She is able to tolerate the proximity of others, but she should avoid public contact, team coordination, or more than occasional interaction with co-workers and supervisors. She is able to work five days a week, eight hours a day at a consistent pace with only normal breaks.

(Tr. 18.)

3

After determining the claimant's RFC, the ALJ at step four must determine whether the claimant has the RFC to perform the requirements of any past relevant work. 20 C.F.R. § 416.920(a)(4)(iv), 416.960. The ALJ concluded that Wallace had no past relevant work. (Tr. 24.)

The last step of the sequential evaluation process requires the ALJ to determine whether the claimant is able to do any other work, considering her RFC, age, education, and work experience. 20 C.F.R. § 416.920(a)(4)(v), 416.960(c). At this step, the ALJ concluded that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (Tr. 25.) Specifically, the vocational expert identified representative jobs of "inspector/hand packager (DOT# 559.687-074)" "cleaner/polisher (DOT# 709.687-010)," "and mail clerk (DOT# 209.687-026)." (Tr. 25.) Therefore, Wallace was not disabled. (Tr. 26.)

**3. Standard of Review**

The court's role in reviewing an ALJ's decision is limited. It must "uphold an ALJ's final decision if the correct legal standards were applied and supported with substantial evidence." *L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1152 (7th Cir. 2019) (citing 42 U.S.C. § 405(g)); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017) (quoting *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010)). "The court is not to 'reweigh evidence, resolve

conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner.'" *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (quoting *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). "Where substantial evidence supports the ALJ's disability determination, [the court] must affirm the [ALJ's] decision even if 'reasonable minds could differ concerning whether [the claimant] is disabled.'" *L.D.R. by Wagner*, 920 F.3d at 1152 (quoting *Elder*, 529 F.3d at 413).

4. **Analysis**

   4.1. **Dr. Rabin**

   A psychological expert, Dr. Michael Rabin, Psy.D., testified at the hearing at the ALJ's request. Wallace argues that "[t]he ALJ's reliance upon the opinion of the testifying psychological expert reveals an utter misunderstanding of schizophrenia." Wallace's argument is, in effect, that Dr. Rabin's testimony was wrong, and therefore the ALJ's conclusions, which relied on that testimony, were wrong. For example, the record indicates that Wallace's IQ dropped significantly over roughly a decade. In Dr. Rabin's opinion, this drop suggested a lack of effort by Wallace on the later test. (Tr. 44.) The ALJ relied on this lack of effort as evidence that Wallace was exaggerating her symptoms. Wallace argues that such a decline in intellectual functioning is consistent with a progression of schizophrenia. She proffers information on schizophrenia from various websites which she argues shows that Dr. Rabin erred. (ECF No. 10 at 9-10.)

5

However, Wallace was diagnosed with schizoaffective disorder, not schizophrenia, a similar but different disorder. *See* American Psych. Assoc., Diagn. & Stat. Man. of Mental Disorders, "Schizophrenia Spectrum and Other Psychotic Disorders" (5th Ed., 2013) available at https://doi.org/10.1176/appi.books.9780890425596.dsm02 ("Distinguishing schizoaffective disorder from schizophrenia … is often difficult. Criterion C is designed to separate schizoaffective disorder from schizophrenia …."). But, more importantly, Wallace offers no authority to suggest that the court can re-evaluate the conclusions of an expert and reverse a decision based on the court's lay opinion. Having frequently admonished ALJ's not to "play doctor," the court finds it must not pretend to be a psychological expert and substitute its opinion for that of an actual expert.

Moreover, Wallace forfeited any objection to Dr. Rabin's testimony by not raising the objection at the hearing before the ALJ. *Cf. Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002) ("When no one questions the vocational expert's foundation or reasoning, an ALJ is entitled to accept the vocational expert's conclusion …."). Wallace was represented by counsel at the hearing, and her attorney questioned Dr. Rabin. (Tr. 46-52, 55-61.) However, Wallace's attorney never challenged Dr. Rabin's testimony in the manner he seeks to now.

**4.2. Symptom Severity**

An ALJ must engage in a two-step process to evaluate a claimant's symptoms. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain." SSR 16-3p. "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms is established, [the ALJ] evaluate[s] the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work related activities…." SSR 16-3p. "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p.

The ALJ gave several reasons why Wallace's symptoms were not as severe as she alleged. (Tr. 18-22.) He summarized these as follows:

> [T]he claimant's allegations and presentation varied significantly and was considerably inconsistent with the longitudinal evidence. The discrepancies between the longitudinal records and the claimant's recent presentations were not explained. Moreover, she went a considerable amount of time without using psychotropic medications and/or mental health treatment and despite this gap in treatment, the claimant's symptoms did not result in emergency treatment, inpatient hospitalization, or in psychiatric day programs. Likewise, she apparently was not arrested and did not have any legal involvement during the period of time where her conditions were untreated, which would suggest decompensation or difficulty. Although

7

> symptoms increased to the point in January 2018 that the claimant decided she would re-establish mental health care, the discussion above shows that medication was helpful. Additionally, the fact that the claimant went as long as she did without treatment demonstrates that her impairments may not have been as limiting or as disruptive as she has alleged in that the claimant was able to work and care for her child during that time.

(Tr. 22-23.)

Significant in the ALJ's assessment was the inconsistency between Wallace's present reported limitations and those identified ten to twelve years earlier as part of special education services she received. (Tr. 19.) For example, when she was just shy of 15 years old, her reading ability was found to be nearly that of a fifth grader. (Tr. 19.) She later graduated high school. (Tr. 19.) But at the hearing Wallace testified she was illiterate. (Tr. 19.) The ALJ appropriately considered this inconsistency in assessing whether Wallace may be exaggerating the severity of her symptoms.

The ALJ also appropriately relied on, as factors for concluding that her symptoms were not as severe as she alleged, the fact that Wallace testified that she did not want to work (Tr. 18), she cared for her young daughter independently (despite the apparent availability of her grandmother to watch the child if needed) (Tr. 18), she was able to work part-time jobs periodically (Tr. 18, 20), and she seemed to function well during a long gap in treatment (Tr. 23). The ALJ also noted that Wallace's conduct during the hearing and consultative examinations was extreme and not otherwise documented in the record. (Tr. 19, 20.)

However, the ALJ also noted that the school records "did not mention problems with psychotic thinking, hallucinations, or distracting internal stimuli." (Tr. 20.)[1] The ALJ noted that, "in April 2007, the school described the claimant as very social and very energetic, polite and cooperative, with a good sense of humor, and the ability to demonstrate compassion and trust towards others." (Tr. 20.) He explained, "Those factors are inconsistent with someone struggling with schizoaffective isolation, paranoia and auditory hallucinations." (Tr. 20.)

But Wallace does not allege she was suffering from schizoaffective disorder when she was in school. To rely on the claimant's condition years before the alleged onset of disability is akin to saying a claimant's back is not as severe as he alleges because he was able to work before he injured his back. The court has not identified any medical evidence in the record suggesting that the absence of schizoaffective symptoms in early-high school is inconsistent with Wallace developing such symptoms in her twenties. *See* American Psych. Assoc., Diagn. & Stat. Man. of Mental Disorders, "Schizophrenia Spectrum and Other Psychotic Disorders" (5th Ed., 2013) available at https://doi.org/10.1176/appi.books.9780890425596.dsm02 ("The typical age at onset of schizoaffective disorder is early adulthood, although onset can occur anywhere from adolescence to late in life.").

---

[1] The ALJ attributed this observation to Dr. Rabin, but the only citation the ALJ offered was to Wallace's school records. The court has not identified any such opinion in Dr. Rabin's testimony.

9

But given that this was just one of many reasons the ALJ gave for concluding that Wallace's symptoms were not as severe as she alleged, the court must consider whether the error was harmless. *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) ("The doctrine of harmless error indeed is applicable to judicial review of administrative decisions."). It is unnecessary to remand a case if the court "can predict with great confidence that the result on remand would be the same." *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018); *Schomas v. Colvin*, 732 F.3d 702, 707-08 (7th Cir. 2013). It is not enough for the court to be able to say that the ALJ *might* have reached the same decision absent the error. *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). To deny remand on the basis that an error was harmless, the court must be able to say "with great confidence" that the same outcome would result on remand and that "decision is overwhelmingly supported by the record." *Id*.

The Commissioner does not argue that this error was harmless. And the court cannot predict with great confidence that the ALJ would have reached the same result absent his erroneous assertion that Wallace's symptoms were not as severe as she alleged because she did not exhibit symptoms in early-high school. The ALJ's reliance on the special education records appears to have been significant in his analysis. Therefore, remand is required.

**4.3. Residual Functional Capacity Assessment**

Wallace argues that the ALJ also erred in his assessment of her RFC. (ECF No. 15 at 14-16.) However, the precise nature of the alleged error is unclear. At first she appears to argue that the ALJ failed to give good reasons for finding only moderate limitations with respect to the B criteria at step three. (ECF No. 15 at 14-15.) But she does not develop any such argument other than to offer vague criticisms of the ALJ's reliance on her past work and activities of daily living as a basis for his conclusion. (ECF No. 15 at 14-15.) Then she proceeds to a general assertion of an ALJ's obligation to include all medical limitations in a claimant's RFC, but never does she point to any alleged error. (ECF No. 15 at 15.) She then recounts some general authority regarding the consideration of mental impairments and the demands of work. (ECF No. 15 at 15-16.) But, again, she does not connect this recitation of legal principles with any alleged error. Finally, she argues, "Substantial evidence supports a finding that Plaintiff would be utterly unable to sustain full time work." However, simply because substantial evidence supports a contrary conclusion is not grounds for remand. "Two contrary conclusions may each be supported by substantial evidence." *Wolvin v. Saul*, No. 18-CV-1285, 2019 U.S. Dist. LEXIS 171953, at *5-6 (E.D. Wis. Oct. 3, 2019).

Therefore, the court finds that Wallace has not demonstrated that the ALJ otherwise erred in his assessment of Wallace's RFC. *Vang v. Saul*, No. 19-1860, 2020 U.S. App. LEXIS 5342, at *11 (7th Cir. Feb. 21, 2020) (unpublished) ("Perfunctory and

undeveloped arguments are waived ….");  *see also Krell v. Saul*, 931 F.3d 582, 586 n.1 (7th Cir. 2019) (quoting *Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016)).

**4.4. Subpoena**

Finally, Wallace argues that the ALJ erred in denying her request to subpoena Dr. Gregory Rudolph, Ph.D, to appear at the hearing. (ECF No. 15 at 16-17.) Dr. Rudolph was a consultative examiner who examined Wallace on May 28, 2013, and prepared a four-page report. (Tr. 448-51.) Wallace argues that by denying her request for a subpoena the ALJ failed in his duty to develop a full and fair record. (ECF No. 15 at 17.)

An ALJ may issue a subpoena "[w]hen it is reasonably necessary for the full presentation of a case …." 20 C.F.R. § 416.1450(d)(1). The court reviews an ALJ's denial of a claimant's request for a subpoena for an abuse of discretion. *Krell v. Saul*, 931 F.3d 582, 586 (7th Cir. 2019).

In denying Wallace's request the ALJ said that "management takes the position that I cannot commit funds for that purpose. That I have to call a separate Medical Expert to testify." (Tr. 36.) A categorical rule against the issuance of subpoenas would be inconsistent with the governing regulations. If the issuance of a subpoenas is "reasonably necessary for the full presentation," it would be error for an ALJ to deny a subpoena. But that is not to say that cost is irrelevant. Both cost and whether there are alternative means

of fully developing the record are certainly factors an ALJ may consider in assessing whether a subpoena is "reasonably necessary."

The ALJ's explanation for his denial of the subpoena did not end with recounting the position of "management." He explained:

> it's unlikely that the witness this many years after taking the examination is going to specifically have independent recollection beyond the four corners of his or her report because they don't keep any records in their office after they finish doing the consultative exam. The next best thing is to have a Medical Expert tell us after they hear what the client has said. What they think about the testimony and the evidence so that I make the right decision.

(Tr. 36.)

Considering the ALJ's explanation and having reviewed Wallace's request for a subpoena (Tr. 381-82), the court finds the ALJ did not abuse his discretion in denying Wallace's request to subpoena Dr. Rudolph.

5. **Conclusion**

In assessing the severity of Wallace's symptoms, and ultimately her RFC, the ALJ appeared to place much weight on the fact that she did not exhibit symptoms of schizoaffective disorder when she was in early-high school. However, the fact that she did not exhibit symptoms before she allegedly began suffering from schizoaffective disorder is not probative of the severity of her present schizoaffective symptoms.

**IT IS THEREFORE ORDERED** that the Commissioner's decision is **reversed**, and pursuant to 42 U.S.C. § 405(g), sentence four, this matter is **remanded** for further rulings consistent with this decision. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 31st day of March, 2020.

_____
WILLIAM E. DUFFIN
U.S. Magistrate Judge